# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **NANCY KOVACIC, ET AL.,** | ) | **Case No. 1:05CV2746** |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE SARA LIOI** |
| | ) | |
| **v.** | ) | |
| | ) | **MEMORANDUM OPINION** |
| **CUYAHOGA COUNTY** | ) | **(Nunc Pro Tunc)\*** |
| **DEPARTMENT OF CHILDREN AND** | ) | |
| **FAMILY SERVICES, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

Plaintiffs in this case are members of the Kovacic family: Nancy, the mother, and her children, Daniel and Katherine, both minors at the time this lawsuit was filed.[1] They bring this civil rights action against various county and city entities and individual municipal employees seeking damages resulting from the warrantless entry into plaintiffs' home and the temporary removal of Katherine and Daniel from the care and custody of Nancy. County defendants include: Cuyahoga County Department of Children and Family Services[2] (CCDCFS), Patricia Campbell Ponstingle, Pam Cameron, Vikki L. Csornok, and Pam

---

[1] This action was originally assigned to the Honorable Patricia A. Gaughan. The matter was transferred to the docket of the Honorable Sara Lioi on March 23, 2007.

[2] The Court  substitutes Cuyahoga County for CCDCFS. *See Wilson v. Stark County Dep't of Human Servs.*, 70 Ohio St. 3d 450, 453 (1994) ("In an action against its department of human services, the County is a real party in interest. A claim against a county department of human services, then, is in effect a claim against a county itself").

\*In its original Memorandum Opinion and Judgment Entry filed this day, the Court inadvertently failed to rule on the claims raised by plaintiff Daniel Kovacic. This filing is entered to correct that omission.

Gaylord.[3] City defendants include: the City of North Olmsted (City), and Officers Frank Chung, John Downs, and James Calvitti,[4] and Sergeant Michael Kilbane.

Before the Court are the motions for summary judgment filed by County defendants and City defendants (Docket Nos. 42 and 56, respectively). Plaintiffs oppose the motions (Docket No. 67), and defendants have filed reply briefs (Docket Nos. 73 and 72). For the reasons that follow, both dispositive motions are **GRANTED** in part, and **DENIED** in part.

## I.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

To fully frame the issues raised by the parties, it is important to review the factual and procedural history that precipitated the filing of the present lawsuit. Following Nancy's divorce from Tom Kovacic, the father of Katherine and Daniel, in 1995, the North Olmsted Police Department and employees of the CCDCFS had numerous encounters with Nancy. The incidents included reports of abuse and neglect of the children by Nancy, erratic behavior by Nancy following an automobile accident, and an incident wherein Daniel Kovacic allegedly stabbed his mother with a pen (Ponstingle Depo. at 32; Chung Depo. at 46-47; Gaylord Depo. at 10-11).[5] There was also a report that Tom Kovacic had assaulted Daniel (Gaylord Depo. at 14).

The Kovacic case was eventually transferred to CCDCFS social worker

---

[3] At all times relevant to the incidents giving rise to this action, defendants Ponstingle, Cameron, Csornok, and Gaylord were each employed as social workers for CCDCFS.

[4] Officer Calvitti passed away on January 26, 2006 and a suggestion of death was filed by counsel for City defendants on June 5, 2006 (Docket No. 27). Officer Calvitti's estate has not been substituted in this case. Additionally, defendant Colleen Kovacic-Nola was dismissed without prejudice on October 18, 2006 (Docket No. 37).

[5] Unless otherwise noted, all deposition references are to the depositions filed by County defendants in connection with their summary judgment motion.

Patricia Campbell Ponstingle.[6] On March 1, 2002, defendant Ponstingle visited Daniel at his school. Daniel advised Ponstingle that his mom had hit him on a regular basis, and that she had given his sister Katherine a bloody nose "awhile ago for being too loud" (Ponstingle Depo. at 46-47).

On March 22, 2002, defendant Ponstingle scheduled an intervention meeting known as a "staffing" to take place on March 26, 2006. A "staffing" is designed to address family issues in an informal setting, and explore possible counseling and therapeutic services available to families living in the County (Cameron Depo. at 23-24; Ponstingle Depo. at 95). The purpose of this particular staffing was to discuss the specific allegations of physical and emotional abuse occurring within the Kovacic family, and one of the goals of this staffing was to discuss possible options available to keep the Kovacic family "intact" (Cameron Depo. at 29-30; Ponstingle Depo. at 94). It is undisputed that the removal of the Kovacic children was not contemplated when the staffing was scheduled (Ponstingle Depo. at 95, 108).

What is disputed is the reason Nancy was not present for the staffing. County defendants suggest that the staffing was rescheduled to March 27, 2002 because Nancy was not available on March 26, 2002 (Ponstingle Depo. at 95). Nancy maintains that Ponstingle contacted her at 10:00 a.m. on March 26, 2002 and advised her that the meeting had been moved to the next day (Docket No. 70, Ex. 1, Affidavit of Nancy Kovacic at ¶ 6).

Other members of the Kovacic family, however, did appear at the offices of the CCDCFS on March 26, 2007. Specifically, Tom Kovacic, Ed Kovacic, the children's grandfather, and Tom's sister Colleen Kovacic-Nola, showed up to participate in the staffing.

---

[6] Defendant Gaylord, CCDCFS intake worker, received the original "referrals" to investigate allegations of threats of neglect of Daniel by Nancy, and a threat of violence by Daniel against his sister Katherine (Gaylord Depo. at 10-11). Defendant Ponstingle took over the case from defendant Gaylord and fielded the "referral" to investigate the allegation that Daniel stabbed his mother with a pen (Ponstingle Depo. at 30).

Officers Chung and Calvitti and Sergeant Kilbane also appeared for the staffing, responding to subpoenas allegedly, and according to plaintiffs wrongfully, issued by Tom Kovacic. In her deposition, defendant Ponstingle testified that she and her supervisors, defendants Cameron and Csornok, met with the Kovacics and the officers as a "professional courtesy" (Ponstingle Depo. at 97).

During this impromptu meeting, the Kovacics and the police officers advised the social workers that Nancy's disturbing behavior was "escalating," and that they felt that Daniel and Katherine were in "imminent risk" of physical harm (Csornok Depo. at 57-63). Officer Chung, who had encounters with Nancy as a police officer and a neighbor, was asked if he believed that Nancy had the potential to be violent toward the children. He agreed that she did (Chung Depo. at 78-79). He recounted the problems Nancy had with certain neighbors, noting that he, himself, had called the police on Nancy for allowing her dog to run loose (Chung Depo. at 44). Officer Chung was also asked to discuss an incident occurring in November, 2001 wherein he, as a police officer, tried to pull Nancy over for a traffic stop. Apparently, Nancy pulled into traffic and was struck by an ambulance. When she exited the car, she began yelling at Officer Chung, blaming him for the accident. She eventually calmed down and was able to discuss the matter with the officer (Chung Depo. at 50-52). Nancy was later convicted of failing to yield to traffic and speeding (Chung Depo. at 53, 164-165).

Sergeant Kilbane was asked to review a stack of police reports documenting the North Olmsted Police Department's numerous contacts with Nancy, dating back to the mid-1990's (Kilbane Depo. at 43-44). While there is some dispute as to which incidents were the focal point of Sergeant Kilbane's review, it appears that Sergeant Kilbane highlighted six incidents from the reports:

4

1)      An April 25, 1995 incident wherein Nancy made an allegedly false police report claiming that Tom Kovacic had kidnapped Daniel and Katherine (Kilbane Depo. at 105-112);

2)      Also in 1995, Nancy allegedly stole a gun from Tom Kovacic's home (Kilbane Depo. at 116-18). Nancy claimed that she was just removing the gun so that Daniel and Katherine would not accidentally come into contact with it (N. Kovacic Aff. at ¶ 11);

3)      The March 22, 2002 allegation in a police report filed by Colleen Kovacic-Nola that Nancy assaulted her (Kilbane Depo. at 120-22). At the time of the staffing, there was no resolution of this police matter, but it appears from the record that it was eventually dismissed (Nola Depo. at 38);

4)      The February 14, 2001 incident wherein Daniel allegedly stabbed Nancy with a pen (Kilbane Depo. at 124-29);

5)      The March 15, 2002 argument between Nancy and Colleen Kovacic-Nola over medication for Daniel during a visitation with his father. Sergeant Kilbane accompanied Ms. Kovacic-Nola to Nancy's house and heard Nancy yelling and screaming at Ms. Kovacic-Nola (Kilbane Depo. at 130-33); and

6)      Kilbane's February 28, 2002 memorandum instructing North Olmsted police officers not to take reports from Nancy regarding alleged violations of a protective order by Tom Kovacic, noting that the allegations were "too nebulous to prosecute criminally" (Kilbane Depo. at 140).

Based upon a review of these incidents, and his personal encounters with Nancy, Sergeant Kilbane expressed an opinion that there was a potential for violence in the home (Kilbane Depo. at 58).

By the end of the March 26, 2002 meeting, CCDCFS representatives determined that the Kovacic children were at a "greater risk level" and the danger to the children was more "imminent" than first thought (Cameron Depo. at 31-35, 40-43). They further determined that it was necessary to immediately remove Daniel and Katherine from Nancy's home *Id.* at 67-70. County defendants concede that the information obtained from the North Olmsted police officers influenced the decision to seek immediate removal of the Kovacic

children (Ponstingle Depo. at 105, 119; Csornok Depo. at 57-63).

That same day, after receiving the approval of her supervisors and the signature of the assigned county assistant prosecuting attorney, defendant Ponstingle caused the execution of a Temporary Emergency Care (TEC) Order (Docket No. 51, Ex. Q). A TEC Order permits the CCDCFS to provide a safe harbor for children in advance of the requisite court hearing[7] (McCafferty Depo. at 22-24, 32, 34-35, 38). The Administrative Judge of the Cuyahoga County Juvenile Court enacted the TEC process, which authorizes the CCDCFS and its social workers to take into custody and provide emergency care for a child deemed to be in need of such care.[8] The Juvenile Court mandates, however, that a complaint for temporary custody be filed with the Juvenile Court by the next business day (McCafferty Depo. at 21-23).

With TEC Order in hand, defendant Ponstingle and social worker Susan Peavey[9] traveled to the North Olmsted Police Department to obtain assistance in the removal of Daniel and Katherine (Ponstingle Depo. at 183; Kilbane Depo. at 66). Certain officers of the North Olmsted Police Department, who are not joined as defendants in this action, then escorted the social workers to the Kovacic house. While they were enroute, Officer Downs called Nancy ostensibly to return a call that Nancy had made to the North Olmsted Police Department regarding an allegation that she had assaulted Ms. Kovacic-Nola a few days prior (Downs Depo. at 46-47). The record shows that City defendants relied upon Officer Downs' call to confirm that Nancy was at home (Downs Depo. at 26, 29).

Officer Downs' was still on the phone with Nancy when the officers

---

[7] The procedures for obtaining a TEC Order provide that a social worker must discuss the present risk factors and safety concerns with the assigned assistant prosecuting attorney, who must determine whether the statutory standards, guidelines, and mandates have been met (McCafferty Depo. at 21-23).

[8] The Cuyahoga County Juvenile Court Standing Order was originally promulgated by Administrative Judge Kenneth A. Rocco on December 13, 1988 (McCafferty Depo. at 17-22). Although this Standing Order was suspended by Administrative Judge Rubin, who succeeded Judge Rocco, the Standing Order was later reinstated by Administrative Judge Peter Sikora (McCafferty Depo. at 17-22).

[9] Peavey is not a defendant in this action.

arrived at her home. Officer Downs' attempts to encourage Nancy to voluntarily let the police into her home proved futile (Downs Depo. at 42, 45-46; 2005 N. Kovacic Depo. at 54-65). Despite the fact that no search warrant had been issued, and the TEC Order did not authorize the officers to enter the Kovacic home without the homeowner's consent, the police ultimately "forced the front door in." After the police entered the home, defendant Ponstingle followed. Daniel and Katherine were turned over to CCDCFS without further incident (Docket No. 58, Ex. B, Affidavit of Michael Kilbane at ¶¶ 152-153).

The following day, March 27, 2002, Assistant Prosecuting Attorney Dorothy Reichenback prepared and filed a Complaint for Temporary Custody with the Cuyahoga County Juvenile Court (Docket No. 58, Ex. L). Thereafter, on March 29, 2002, the Juvenile Court conducted a "Shelter Hearing," as required by the TEC procedures. Nancy was present at the hearing and was represented by counsel. Following the hearing, the Magistrate determined that the emergency removal was justified (Docket No. 58, Ex. O). The Magistrate issued an Order granting temporary custody of the Kovacic children to CCDCFS based on a finding of probable cause of imminent risk of child abuse and neglect. *Id.* While Nancy had the right to appeal the Magistrate's decision, it is undisputed that she did not do so.

In July 2003, the proceedings before the Cuyahoga County Juvenile Court were transferred to the Lake County Juvenile Court because Nancy moved from North Olmsted to Eastlake, Ohio (Docket No. 19, Amended Complaint at ¶ 31). The Lake County Juvenile Court issued an order, dated November 7, 2003, dismissing the matter after finding that there was no adjudication of CCDCFS's complaint within the time frame mandated by Ohio Rev.

Code § 2151.35(B)(1).[10] Daniel and Katherine were returned to Nancy's custody and care approximately ten (10) months after they were forcibly removed from the family home (Amended Complaint at ¶ 25).

The present action was initiated on November 28, 2005. In the Amended Complaint, plaintiffs assert claims under 42 U.S.C. § 1983 for deprivations of their rights under the Fourth and Fourteenth Amendments to the U.S. Constitution. They also present a claim, presumably under 42 U.S.C. § 1985, for conspiracy, and allege further that there is municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). In addition, plaintiffs raise a claim for the state tort of intentional infliction of emotional distress.

Pursuant to Fed. R. Civ. P. 56, defendants seek summary dismissal of all claims against Nancy on the grounds that they are time-barred, as well as the dismissal of all remaining claims as barred by the *Rooker-Feldman* doctrine. Defendants also contend that plaintiffs cannot establish that their constitutional rights have been violated. Finally, defendants seek absolute and/or qualified immunity for all individual County and City defendants.

## II.

### **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . .

Rule 56(e) specifies the materials properly submitted in connection with a

---

[10] In his Judgment Entry, Judge Weaver explained that the matter "had now been pending for six hundred eleven days without a disposition being entered and without an adjudication ever having been journalized. The Court finds such delay to be in violation of the Ohio Revised Code and of the mother's right to due process, and orders that the matter is dismissed" (Docket No. 70, Ex. 11).

motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the  matters stated therein [. . .] The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), *citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988).  The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*. It is against this backdrop that the Court considers defendants' dispositive motions.

### III.

### LAW AND ARGUMENT

A.    *Statute of Limitations*

Plaintiffs' state court claims are governed by Ohio Rev. Code § 2744, which controls the commencement of state law claims against political subdivisions. Specifically, § 2744.04(A) provides:

> An action against a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, whether brought as an original action, cross-claim, counterclaim, third-party claim, or claim for subrogation, *shall be brought within two years after the cause of action accrues*, or within any applicable shorter period of time for bringing the action provided by the Revised Code. The period of limitation contained in this division shall be tolled pursuant to section 2305.16 of the Revised Code. This division applies to actions brought against political subdivisions by all persons, governmental entities, and the state. (Emphasis added).

Similarly, the statute of limitation for 42 U.S.C. § 1983 actions arising in Ohio is two years. *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003); *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989).

Defendants argue that every fact that forms the basis for plaintiffs' claims took place more than two years before Nancy filed any lawsuit. In support of this argument, defendants point to the fact that the "unintentional" staffing meeting occurred on March 26, 2002, and it was at this meeting that it was decided that immediate removal of Daniel and Katherine was necessary (Cameron Depo. at 67-70). Moreover, the actual warrantless entry into the Kovacic home and the removal of the children also took place on March 26, 2002, and the Magistrate's ruling granting temporary custody to CCDCFS was issued two days later on March 29, 2002. Because the warrantless search of her home and the forced removal of her children are at the center of Nancy's claims, any action would have had to be commenced within two years of the date of the last act that forms the basis of her claims, March 29, 2002.

Nancy first commenced an action arising out of these events on August 17, 2004 when she filed a complaint in the Cuyahoga County Common Pleas Court (Docket No. 55, Ex. U, Cuyahoga County Common Pleas Docket, Case No. CV-04-538881). This action contained only state court claims and only identified CCDCFS, Ponstingle, Cameron, and Csornok as defendants. The action was voluntarily dismissed by Nancy on November 8, 2005. *Id.* Plaintiffs did not file the present action, which included for the first time federal causes of action and additional defendants, until November 28, 2005. Even if the statute of limitations was tolled after the filing of the state court action, and even if Nancy had brought federal claims and sued all defendants in that initial action, defendants argue that the action was commenced beyond the statutory period.

Plaintiffs do not challenge the applicability of the two-year limitation period for Nancy's federal and state claims. Rather, plaintiffs argue that:

the wrongs committed by the defendants were ongoing; the children were illegally removed from their home on March 26, 2002, but the constitutional violations

11

> which deprived the plaintiffs of their due process and search and seizure rights
> continued as long as the children were out of the house, which lasted until January
> 2003, and the threat of continued violations continued until November, 2003
> when a Lake County judge dismissed the case and declared that Nancy Kovacic's
> due process rights had been violated by a failure to have the case adjudicated.

(Docket No. 67 at 49). Plaintiffs also argue that defendants continued to conspire against them after the initial removal to continue to deprive them of their constitutional rights. *Id*.

In determining whether plaintiffs' allegations constitute a "continuing violation," the Court must conduct a three-part inquiry:

> First, the defendant's wrongful conduct must continue after the precipitating event
> that began the pattern…Second, injury to the plaintiff must continue to accrue
> after that event. Finally, further injury to the plaintiffs must have been avoidable
> if the defendants had at any time ceased in the wrongful conduct.

*Tolbert v. State of Ohio DOT*, 172 F.3d 934 (6th Cir. 1999).  In a § 1983 action, "a 'continuing violation is occasioned by continual unlawful acts, not by continual ill effects from the original violation.'" *McCune v. the City of Grand Rapids*, 842 F.2d 903, 905 (6th Cir. 1988), *quoting Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981).

Applying this three-part test, the court in *Edison v. Tenn. Dep't of Children's Servs.*, 477 F. Supp. 2d 923 (E.D. Tenn. 2007), rejected an argument strikingly similar to the one raised by Nancy. There, a father brought an action under 42 U.S.C. § 1983 and § 1985 alleging violation of his civil rights when a state agency removed his children from his custody. In finding that his action was time-barred, the court rejected the father's argument that the limitations period did not begin to run until the return of his children by the juvenile court. *Edison*, 477 F. Supp. 2d at 928.

The court in *Edison* began its analysis by noting that "simply retaining the children in the State's custody without filing a custody petition is not alone sufficient to establish a continuing violation." *Edison*, 477 F. Supp. 2d at 926. With respect to the first prong of the

"continuing violation" test, the court found that the father's due process concerns were addressed at the hearing on the agency's petition when the juvenile court found probable cause to conclude that the children were neglected. The father was on notice at the conclusion of the hearing of the alleged violation, and the limitations period began to run on that date. *Id*. Further, the court found that the father's vague allegations of an on-going conspiracy did not rise to the level of a continuing violation. *Id. See e.g., Minow v. Tennessee*, 191 F.3d 452 (6th Cir. 1999).

In the present case, the last act that precipitated the alleged constitutional deprivation occurred on March 29, 2002 when the Magistrate concluded that there was probable cause for a finding of abuse and neglect, and awarded temporary custody of the children to CCDCFS. The fact that the alleged wrongful separation of the family continued after that date only points to "continuing ill effects" from the original violation. *See McCune*, 842 F.2d at 905. As for plaintiffs' vague allegations of an on-going conspiracy to continue to keep the children from Nancy's custody, they are insufficient to extend the date upon which Nancy's claims accrued (Amended Complaint at ¶ 24). *See Edison*, 477 F. Supp. 2d at 926.

Plaintiffs alternatively argue that Nancy's causes of action did not accrue until the state juvenile court proceedings ended in November of 2003. Plaintiffs suggest that they "would have been precluded from filing a lawsuit at least until the return of the children, and probably until after the Juvenile case was dismissed in November, 2003…." (Docket No. 67 at 49). Plaintiffs reach this conclusion upon a belief that the district court would have abstained from ruling on the civil rights action until after the juvenile court had resolved the custody dispute.

*Younger* abstention applies when the state proceeding is currently pending, involves an important state interest, and affords the plaintiff an adequate opportunity to raise

13

constitutional claims.[11] *Coles v. Granville*, 448 F.3d 853, 865 (6th Cir. 2006). *See Younger v. Harris*, 401 U.S. 37 (1971). In *Edison*, the court rejected the argument that a § 1983 action did not accrue until after the juvenile custody matter was resolved because the district court would have dismissed the civil rights action anyway under the *Younger* abstention doctrine. In so ruling, the court observed that the Sixth Circuit had determined that a district court, when abstaining under *Younger*, should stay the proceedings rather than dismiss without prejudice to avoid "placing 'plaintiffs in a sometimes difficult position of refilling their case before the statute of limitations expires.'" *Edison*, 477 F. Supp. 2d at 927, *quoting Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995). Because the civil rights action would have likely been stayed, rather than dismissed, pending the conclusion of the juvenile court proceedings, the court found no basis for concluding that the juvenile court proceedings tolled the limitations period for the federal action. *Id*.

Similarly, plaintiffs' federal action would likely have been stayed, rather than dismissed, had it been filed prior to the completion of the state custody case. Consequently, Nancy cannot take advantage of the juvenile court's delay in adjudicating the CCDCFS' custody petition to save her federal claims. Because Nancy did not file her action within two years of the last date giving rise to her federal and state causes of action, her claims are time-barred.

**B.**   *Application of the Rooker-Feldman Doctrine*

While the federal and state claims filed by Daniel and Katherine are not time-barred inasmuch as the limitations period was tolled during their infancy, defendants argue that the *Rooker-Feldman* doctrine operates to frustrate this Court's jurisdiction over all of the

---

[11] In their opposition brief, plaintiffs erroneously attempt to employ the *Rooker-Feldman* doctrine in support of their argument. As will be discussed below, the *Rooker-Feldman* doctrine limits federal jurisdiction to avoid federal appeals of state court matters. *See Tropf v. Fid. Nat'l Title Ins. Co*., 289 F.3d 929, 937 (6th Cir. 2002). Plaintiffs' argument invokes the *Younger* abstention doctrine.

children's claims.[12] The Court finds that application of this doctrine is appropriate with respect to the claims arising out of the removal of the children from their mother.

In *District of Columbia Court of Appeals v. Feldman*, 560 U.S. 462 (1983), the Supreme Court held that federal court review of state court proceedings is jurisdictionally limited to the Supreme Court of the United States by virtue of 28 U.S.C. § 1257. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). In order for the *Rooker-Feldman* doctrine to apply, the issue before the federal court must be "inextricably intertwined" with the claim asserted in the state court proceeding. *Tropf v. Fid. Nat'l Title Ins. Co.*, 289 F.3d 929, 937 (6th Cir. 2002), *citing Catz v. Chalker*, 142 F.3d 279, 293 (6th Cir. 1998). As the Supreme Court explained: "[w]here federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment."[13] *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987). *See also Catz*, 142 F.3d at 293. In contrast, the doctrine does not bar federal court jurisdiction where the claim is "a general challenge to the constitutionality of the state law applied in the state action." *Catz*, 142 F.3d at 293. *See also Patmon v. Michigan Supreme Court*, 224 F.3d 504, 506 (6th Cir. 2000).

There can be no doubt that the federal and state claims arising out of the removal of the children are "inextricably intertwined" with the state court juvenile proceedings and the issue of probable cause in the juvenile court case. Indeed, it would be impossible for this Court to grant Daniel and Katherine relief on the civil rights claims relating to their removal from the family home without ruling that the Magistrate in the juvenile court was wrong in

---

[12] Despite the fact that the Court has ruled that Nancy's claims are time-barred, the Court will continue to refer to the arguments offered in opposition to summary judgment as raised by "plaintiffs" inasmuch as the arguments were raised by all plaintiffs in their opposition brief.
[13] Though not relevant in the present case, the *Rooker-Feldman* doctrine also precludes federal district court jurisdiction where the claim is "a specific grievance that the law was invalidly—even unconstitutionally—applied in the plaintiff's case." *Catz*, 142 F.3d at 293.

finding probable cause to support the removal. *See e.g., Tropf*, 289 F.3d at 937-38 (§ 1983 conspiracy action dismissed under *Rooker-Feldman* doctrine because property owners could not prevail on their federal action without challenging the results in state court actions upholding the validity of warranty deeds on certain properties). *See Pennzoil,* 481 U.S. at 25.

Plaintiffs do not address defendants' *Rooker-Feldman* abstention argument. Nonetheless, because the argument affects the Court's jurisdiction over certain claims, it will address the question of whether plaintiffs have advanced a general challenge to the constitutionality of a statute such that *Rooker-Feldman* abstention would not be appropriate. *See Catz*, 142 F.3d at 293; *Patmon*, 224 F.3d at 506.

In *Patmon*, an attorney initiated a federal lawsuit after he had been suspended from the practice of law, and had unsuccessfully challenged his suspension in the state courts. The attorney alleged that *Rooker-Feldman* abstention did not divest the federal court of jurisdiction because his federal lawsuit amounted to a general challenge to the state rules and procedures governing attorney discipline. The court rejected this argument, observing that "the core of his constitutional claims is a challenge to the State of Michigan's application of the rules to him. Plaintiff's complaint alleges that certain rules or practice violated the Constitution, but only explains how they did so when applied to him." *Patmon*, 224 F.3d at 510. In reaching this conclusion, the Sixth Circuit held that the "federal district courts will still lack subject matter jurisdiction over constitutional challenges to state rules and procedures under the *Rooker-Feldman* doctrine, however, where the general constitutional challenge is 'inextricably intertwined' with state judicial proceedings." *Id.* at 509-510, *citing Feldman*, 460 U.S. at 486-487.

While plaintiffs question the constitutionality of the juvenile court's

16

procedures for the emergency removal of children at risk, a fair reading of the Amended Complaint, as well as a critical review of plaintiffs' opposition brief, demonstrates that the core of plaintiffs' constitutional claims center on these rules and regulations as they were applied to them. Plaintiffs do challenge the propriety of the Standing Order, but the focal point of their allegations is an attack upon the manner in which defendants sought to use the Standing Order to deprive plaintiffs of their right to family integrity. Indeed, woven throughout the Amended Complaint are the threads of bad faith, conspiracy, and a deliberate indifference on the part of defendants. It was not just the rules and regulations that worked the alleged injustice, but rather the use of these regulations in a nefarious way that resulted in alleged constitutional violations. As such, finding that any constitutional challenge to the juvenile court's rules is "inextricably intertwined" with the juvenile court's judicial proceedings, the Court must conclude that it lacks subject matter jurisdiction over these claims. *See Patmon*, 224 F.3d at 509-510.

Plaintiffs had the opportunity to appeal the Magistrate's finding of probable cause, but failed to do so. Despite Plaintiffs' representation to the contrary, the Order granting CCDCFS temporary custody of the children was a final, appealable order from which an appeal could have been taken within 30 days under Ohio App. R. 4(A).[14] *In re Murray*, 52 Ohio St. 3d 155 (1990) syllabus ("An adjudication by a juvenile court that a child is 'neglected' or 'dependent' as defined in R.C. Chapter 2151 followed by a disposition awarding temporary custody to a public children services agency pursuant to R.C. 2151.353(A)(2) constitutes a 'final order' within the meaning of R.C. 2505.02 and is appealable to the court of appeals pursuant to R.C. 2501.02"). *See also In re T.V.*, 2005 Ohio App. LEXIS 3884, * 26 (Ohio Ct. App., Franklin

---

[14] Plaintiffs claim that there was no final, appealable order in the state juvenile court custody case until the Lake County Juvenile Court ultimately dismissed the action in February 2003. Based upon the authority cited above, it is clear that the Magistrate's ruling, which was directly related to the alleged unlawful deprivation of the right to family integrity, was immediately appealable under the Ohio appellate rules.

County, August 18, 2005); *In re Blevens*, 2001 Ohio App. LEXIS 1357, *9 (Ohio Ct. App., Hocking County, March 20, 2001).  Having failed to file a timely appeal in state court, plaintiffs may not use a federal lawsuit to "do indirectly what [they] no longer can do directly." *Rooker*, 263 U.S. at 416.  Under the *Rooker-Feldman* doctrine, the Court is divested of jurisdiction to entertain the federal and state claims related to the removal of the children.

      **C.**   ***Fourth Amendment Violations***

      While defendants invite the Court to dismiss all of the remaining claims under the *Rooker-Feldman* doctrine, the Court finds that this doctrine does not rob the Court of jurisdiction over the claims associated with the warrantless entry into the Kovacic home. The juvenile court proceedings that began on March 29, 2002 and were concluded in February of 2003 did not address the initial entry into the home by the North Olmsted Police Department and defendant Ponstingle.

      In Count One of the Amended Complaint, plaintiffs allege that the illegal search and seizure on March 26, 2002 violated their rights under the Fourth and Fourteenth Amendments to the U.S. Constitution (Amended Complaint at ¶ 35-37). At the outset, City defendants argue that the viability of Count One should be analyzed exclusively under the Fourth Amendment (Docket No. 56 at 13). This argument is well taken.

      "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of governmental behavior, that Amendment, and not the more generalized notion of 'substantive due process' [under the Fourteenth Amendment], must be the guide for analyzing these claims." *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1013 (6th Cir. 1999).  Because the Fourth Amendment provides an explicit textual source of constitutional protection for unwarranted search and seizures, this § 1983 claim shall

be analyzed under the Fourth Amendment.

1.    Exigent Circumstances

A "basic principle of Fourth Amendment law [is that] searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). Nonetheless, a warrantless search will not run afoul of the Fourth Amendment if it is conducted pursuant to certain specifically established and narrowly tailored exceptions, such as the exigent circumstances exception. *Katz v. United States*, 389 U.S. 347, 357 (1967).

Neither the Standing Order, nor the TEC Order, gave defendants the authority to enter the Kovacic's home. Nonetheless, City defendants argue that exigent circumstances justified the March 26, 2002 forced entry because "there is no dispute that the [CC]DCFS came to the North Olmsted Police Department for assistance in the removal of the Kovacic children, premised on the belief that the children were in imminent risk of abuse and neglect" (Docket No. 56 at 16). The record, however, does not support a finding that exigent circumstances existed when the police forcibly entered plaintiffs' home.

The exigent circumstances exception to the warrant requirement is narrowly drawn. *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). Moreover, the government bears the burden of overcoming the presumption that the warrantless entry was unreasonable by establishing the exception of exigent circumstances. *United States v. Oliver*, 686 F.2d 356, 371 (6th Cir. 1982). Defendants have failed to meet this burden.

According to the Sixth Circuit, exigent circumstances justifying a warrantless entry occur within four general categories: 1) hot pursuit of a fleeing felon; 2) imminent destruction of evidence; 3) the need to prevent a suspect's escape; and 4) a risk of

danger to the police or others. *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996). It is the risk of danger to Daniel and Katherine that defendants look to for a finding of exigent circumstances. However, exigent circumstances will only be found where "real immediate and serious consequences" would "certainly occur were a police officer to postpone action to get a warrant." *O'Brien v. City of Grand Rapids,* 23 F.3d 990, 997 (6th Cir. 1994). They will not be found where "no evidence indicates that [the occupants of a home were] in immediate threat of death or severe physical harm." *Roska v. Peterson*, 304 F.3d 982, 990 (10th Cir. 2002).

A review of the incidents leading up to March 26, 2002 fails to show a likelihood that Daniel and Katherine were in immediate threat of severe physical harm. *See Roska*, 304 F.3d at 990. Defendants concede that, prior to the March 26, 2002 staffing, CCDCFS had no intention of removing Daniel and Katherine from the home (Ponstingle Depo. at 95, 108). Moreover, the incidents that defendants rely upon to establish this heightened concern that the children were in imminent risk of harm were known to defendants prior to the staffing. In fact, the incident wherein Nancy allegedly pulled Katherine's hair and gave her a bloody nose, which appears to have represented the only documented specific act of violence by Nancy against her children, was known to Social Worker Ponstingle for four weeks before the staffing. Moreover, according to Ponstingle, this incident and the incident wherein Daniel stabbed Nancy with a pen were alone insufficient to warrant removal of the children (Ponstingle Depo. at 38).

Of course, even if the situation posed a serious risk of harm to the children, there is no indication that any potential harm would imminently come to fruition. The rationale for the exigent circumstances exception is that some situations require immediate action, with no time to get a warrant. *See Rohig*, 98 F.3d at 1517. In the present case, defendants have not offered evidence to show that there was no time to get a warrant.

Besides having received the subjective opinions and speculations offered by the police officers and by Nancy's ex-husband's family, nothing had changed from the time the staffing was scheduled till the police broke down plaintiffs' door. There was no evidence that Nancy had made any threats to take dangerous action (Kilbane Depo. 86, 88), and the only recent allegations involved Nancy's heated exchanges with her ex-husband's fiancée. Most of the incidents, including all of the alleged incidents involving Nancy and the children, occurred weeks, if not months and years, before the staffing. Based upon this record, the Court finds that defendants have failed to demonstrate that there was insufficient time to obtain a warrant. *See e.g., O'Donnell v. Brown*, 335 F. Supp. 2d 787, 805 (W.D. Mich. 2004) (no exigent circumstances found where the perceived danger to the children was merely speculative and insufficiently serious); *Walsh v. Erie County Dep't of Job and Family Servs.*, 240 F. Supp. 2d 731, 750 (N.D. Ohio 2003) (anonymous complaint about clutter and poor health conditions did not demonstrate that the delay in obtaining a warrant would have placed the children at any immediate risk of harm).

### 2.  Probable Cause Finding by the Magistrate

Alternatively, City defendants attempt to justify the warrantless entry by suggesting that the Court is bound by the Juvenile Court Magistrate's finding of probable cause. Defendants argue that this Court must give preclusive effect to the Magistrate's March 29, 2002 ruling that probable cause existed to support the removal of the children on March 26, 2002 because the children were in "immediate danger" and "removal [was] necessary to prevent immediate or threatened physical or emotional harm." According to City defendants, finding that "the factual issue of imminent risk has been conclusively decided by the Magistrate's emergency order, Plaintiffs cannot show that [defendants] violated their Fourth Amendment rights since the

warrantless entry into Plaintiffs' home was supported by exigent circumstances" (Docket No. 72 at 12).

At first blush this argument has appeal.  After all, this Court is obligated to give a state court judgment the same preclusive effect in federal court that it would be given in the courts of the rendering state. *Smith v. Thornburg*, 136 F.3d 1070, 1088 (6th Cir. 1998). Under Ohio law, issue preclusion or collateral estoppel precludes relitigation of an issue that has been "actually and necessarily litigated and determined in a prior action." *Krahn v. Kinny*, 43 Ohio St. 3d 103, 107 (1989).  A review of the proceedings in the juvenile court, and a close examination of the Magistrate's Order, itself, however, reveal that City defendants' argument is fatally flawed.

In the instant Order, which is nothing more than a boilerplate form, the Magistrate checked a box marked "there *is* probable cause for removal of the child(ren) pursuant to Revised Code Section" and then also marked the box for "2151.31(A)(3)(c)." She made no factual findings, and offered no legal conclusions to support her determination. Under similar circumstances, courts have refused to give preclusive effect to a magistrate's finding of probable cause. *See e.g., Phelps v. City of Indianapolis*, 2004 U.S. Dist. LEXIS 9151 (S.D. Ind. May 10, 2004) (the fact that the magistrate had placed a checkmark in a box on a form indicating that probable cause had been found was insufficient to warrant preclusive effect in a subsequent § 1983 action). *See also Bailey v. Andrews*, 811 F.2d 366, 370 (7th Cir. 1987).

Moreover, while it appears from the record that Nancy was present at the "Shelter Hearing" on March 29, 2002 and that she was represented by counsel, it entirely unclear whether this hearing bore any of the other hallmarks of a "full and fair" hearing, including the opportunity to present evidence and to cross-examine adverse witnesses. Absent evidence of

these safeguards, it cannot be said that the relevant issue was fully and fairly litigated. As such, the Magistrate's Order is not entitled to preclusive effect.[15] *See e.g., Phelps. See also Smith v. Thornburg*, 136 F.3d 1070, 1087-88 (6th Cir. 1998) (probable cause determination from a criminal preliminary hearing not entitled to preclusive effect in a subsequent § 1983 action where issue not fully and fairly litigated).

It is also clear from the face of the Magistrate's Order that the inquiry was limited to a review of the factual basis supporting the removal of the children. The preprinted language in the "form" Order simply sets forth the standard for a finding of probable cause to support the removal. There is absolutely no indication that the Magistrate reviewed the circumstances surrounding the warrantless entry into the house; nor did she rule on its validity. Under these circumstances, this Court cannot give preclusive effect to a ruling in the state juvenile court proceeding, which in no way touched upon the Fourth Amendment violation alleged in the present lawsuit.

Ultimately, the Court finds that defendants have failed to demonstrate that the portion of the children's first cause of action, involving the warrantless entry into their home under the Fourth Amendment, is subject to summary dismissal. Consequently, defendants' motion for summary judgment on Count One of the Amended Complaint is denied as it relates to the warrantless entry.

**D.** *Monell Liability*

1. <u>City of North Olmsted</u>

Defendant City argues that liability under 42 U.S.C. § 1983 cannot attach because plaintiffs have not established a constitutional injury or the existence of a policy or

---

[15] While the Court rules that it will not give the Magistrate's Order preclusive effect, it does not render a ruling on the validity of the Order, or the TEC process, itself. Any perceived infirmities in the Order should have been raised on direct appeal.

custom that was the moving force behind the injury alleged. The Court finds sufficient evidence to support a claim for municipal liability under *Monell*.

A governmental entity may not be held liable under 42 U.S.C. § 1983 for an employee's conduct on the basis of respondeat superior. *Monell*, 436 U.S. at 690-91. Rather, a plaintiff must show that the government entity itself is the wrongdoer. *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992). In order to establish governmental liability, a plaintiff must demonstrate that an officially executed policy, or the tolerance of a custom, led to or caused the deprivation of a constitutionally protected right. *Collins*, 503 U.S. at 122.

The term "policy" generally "implies a course of action consciously chosen from among various alternatives." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). A policy reflects "a deliberate choice to follow a course of action…made among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). A "custom" for purposes of *Monell* liability must be "so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691. In turn, the concept of "law" includes "deeply embedded traditional ways of carrying out state policy." *Nashville, C. & S. L. Railway v. Browning*, 310 U.S. 362, 369 (1940). In short, a "custom" is a "legal institution that is permanent and established" but not memorialized by written law. *Feliciano v. City of Cleveland*, 988 F. 2d 649, 655 (6th Cir. 1993).

As discussed above, the Court has determined that the warrantless entry into the Kovacic's home violated plaintiffs' constitutional right to be free from unlawful searches. With respect to an established City policy, plaintiffs argue that it was the police department's policy of assisting the County in removals without insisting on seeing an actual

24

court order. Moreover, plaintiffs maintain that it was reliance on the County's TEC process pursuant to the "Standing Order" that led to the Fourth Amendment violation (Docket No. 67 at 42).

In response, defendant City argues that plaintiffs failed to offer any evidence to support this alleged "policy." The existence of such a policy, however, finds support in the record. In his deposition, Sergeant Kilbane testified that social workers regularly employ the assistance of the North Olmsted Police Department in taking children into emergency custody. Specifically, Sergeant Kilbane testified that "[p]retty much anytime they go to a home to remove a child in North Olmsted, they [CCDCFS] come to the police station to accompany them" (Kilbane Depo. at 66-67). While Sergeant Kilbane testified that he believed that the Order the social workers had to remove the Kovacic children was signed by a judge, he admitted that he did not look to see who had actually signed it (Kilbane Depo. at 67). When asked why he did not closely examine the Order, he stated that: "we had dealt with children services before, and, generally, it's their proceedings. We're just there to assist them" (Kilbane Depo. at 67).

In *O'Donnell*, the court found that a police department had a policy of assisting social workers in taking children into custody, based upon a verbal order from a referee to remove the children, and that this policy was the driving force in the unlawful entry into the plaintiff's home and the illegal removal of their children. While the police department was relying upon the family court's verbal order of removal, it was the police who actually performed the act of forcibly entering the home to assist in executing the court order. *O'Donnell*, 335 F. Supp. 2d at 816. In reaching this conclusion, the court underscored the fact that the social workers acknowledged that they could not go into a home to remove a child unless the police lead them in. *Id*.

Like the police department in *O'Donnell*, the North Olmsted Police Department had a policy of assisting CCDCFS in removing children from their home pursuant to TEC Orders. Moreover, like the social workers in *O'Donnell*, employees of the CCDCFS knew that the TEC Order did not give cause for a warrantless entry into the Kovacic home (McCafferty Depo. at 39).  It was defendant City's police officers who forcibly gained access to the home without a warrant or exigent circumstances. Under the circumstances, it cannot be said that defendant City is entitled to summary judgment on the issue of municipal immunity.

2.    County Liability

As for defendant County's liability under *Monell*, plaintiffs argue that it was the County's policy "to use police to take them into homes they could not otherwise enter legally…." (Docket No. 67 at 42). Plaintiffs point to the fact that the social workers were aware that the TEC Order did not entitle them to enter a home without a warrant, but that once the police had forced entry, "it was somehow acceptable to enter the home" *Id*. (*See* McCafferty Depo. at 50).

The Director of the CCDCFS, James McCafferty, testified at his deposition that, once a TEC Order is in place, it is the practice of the CCDCFS to have law enforcement accompany social workers to effectuate the removal of the children (McCafferty Depo. at 55-56). While he indicated that his department did not have the legal authority to "just enter someone's home," Mr. McCafferty did testify that it was his belief that the police have the authority to enter a private home without a warrant to remove the children because "they go with us to do that"[16] (McCafferty Depo. at 38-39, 56).

Based on the state of the record, the Court finds that the CCDCFS had a

---

[16]Mr. Cafferty also testified: "We don't ever just enter somebody's home. We don't have the legal authority to just enter someone's home. The only entity that I'm aware of that can enter the home are [sic] the police, law enforcement" (McCafferty Depo. at 39).

policy of obtaining TEC Orders to justify the removal of the children at risk, and that they engaged the services of the local police to justify the warrantless entry into the house to remove the children. Without question, this policy was the "moving force" behind the constitutional violation on March 26, 2002. *See Monell*, 436 U.S. at 694.

E.    ***Absolute and Qualified Immunity***

1. <u>Defendant Ponstingle</u>

It is beyond dispute that defendant Ponstingle was the only County defendant that was present on March 26, 2002 when members of the North Olmsted Police Department entered the Kovacic's home. Moreover, it is clear that defendant Ponstingle entered the home only after the police had forcibly gained entry to the premises (Ponstingle Depo. at 190-92). County defendants contend that defendant Ponstingle is entitled to absolute and/or qualified immunity from plaintiffs' Fourth Amendment claim.

Absolute immunity protects acts that are judicial or prosecutorial in nature and performed by or related to a general function normally performed by an adjudicator. *Dean v. Byerley*, 354 F.3d 540, 556 (6th Cir. 2004). Social workers receive absolute immunity when they initiate proceedings related to child welfare and while functioning in roles intimately associated with the judicial phase of the proceedings. *Rippy v. Hattaway*, 270 F.3d 416, 421-22 (6th Cir. 2001). As the court found in *O'Donnell*, a social worker's recommendation to a family court, as well has her investigation leading up to her recommendation, relate to the initiation of judicial proceedings, and thus fall within the scope of absolute immunity. *O'Donnell*, 335 F. Supp. 2d at 826-27. *See Rippy*, 270 F.3d at 422-23. The *O'Donnell* court also found, however, that a social worker's actions in carrying out a removal were not covered by absolute immunity. *See e.g., Achterhof v. Selvaggio*, 886 F.2d 826, 830-31 (6th Cir. 1989).

The CCDCFS' decision to initiate custody proceedings against Nancy was intimately associated with the judicial phase of juvenile proceedings, and was protected by absolute immunity. *See e.g., Rippy* at 421-22. Similarly, the decision to pursue a TEC Order to effectuate the emergency removal of the Kovacic children was also judicial in nature. However, defendant Ponstingle's involvement in the removal itself, including her role in the warrantless entry into the Kovacic's home, was not. S*ee e.g., O'Donnell*, 335 F. Supp. 2d at 827. As such, defendant Ponstingle is not entitled to absolute immunity.

Qualified immunity shields from liability government officials performing discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity determination requires a two part analysis. First, a court must determine whether, viewing the facts in the light most favorable to the party asserting the injury, the plaintiff has alleged a deprivation of a constitutionally protected right. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). If so, "then the second step is to determine whether the right is so 'clearly established' that a 'reasonable official would understand that what he is doing violates that right.'" *Brennan v. Township of Northville*, 78 F.3d 1152, 1154 (6th Cir. 1996), *quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Throughout the analysis, the burden is on plaintiffs to show that defendants are not entitled to qualified immunity. *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir. 2006). The Court has already determined that the entry into the Kovacic home was not excused under any of the exceptions to the warrant requirement of the Fourth Amendment. Accordingly, the Court proceeds to the second step of the analysis.

A right is "clearly established" for qualified immunity purposes when the contours of the right are sufficiently clear, even if the specific action in question has never been

held unlawful. *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005). The conclusion as to whether the right was "clearly established" is a determination that "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 202. The dispositive inquiry is "whether it would be clear to a reasonable officer [or social worker] that his conduct was unlawful in the situation he confronted." *Id.*

The right to be free from unnecessary warrantless searches in one's home is "clearly established." A person's privacy interest is at its highest in a person's home. *Payton v. New York*, 445 U.S. 573, 590 (1980). Courts have routinely found that "entry of social workers or police officers into a home to inspect or remove a child" requires a warrant. *Roska,*, 304 F.3d at 999; *Walsh v. Erie County Dep't of Job and Family Servs.*, 240 F. Supp. 2d 731, 758-59 (N.D. Ohio 2003) (In rejecting a finding of qualified immunity for a social worker, the court observed: "[o]bjectively viewed, a state agent whose duties take her into private homes is deemed to know about the basic constitutional constraints on her activities"). *See e.g., Good v. Dauphin County Social. Servs. for Children & Youth*, 891 F.2d 1087, 1093-94 (3d Cir. 1989). *See also Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir. 1999) (social worker that used police to coerce entry into a home was not entitled to qualified immunity).

Defendants contend that the facts of the case are squarely on point with the Sixth Circuit's decision in *Jordan v. Murphy*, 145 Fed. Appx. 513 (6th Cir. 2005). There, a social worker entered a home after police officers had forced entry into the home, based upon officers' observations that the children were living in deplorable conditions suggesting that they were in imminent threat of physical harm.[17] In finding a basis for qualified immunity, the court

---

[17] Following a tip that twenty-five children were living under one roof in unhealthy conditions, a police officer went to the residence and spoke on the front porch to one of the children. The officer observed that the house was filthy and full of trash. He also observed several children in the house. The officer conveyed this information to the social worker when she arrived on the scene. *Id.* at *3.

concluded that "a reasonable case worker hearing the police officers' observations and conclusions could have reasonably understood that there was an imminent threat of physical harm to the children inside Jordan's home." *Id*. at *10. The court concluded that a reasonable case worker would have deferred to the police officers' conclusions. *Id*. at *11.

In the present case, defendant Ponstingle did not defer to any conclusions on the part of any police officer that Daniel and Katherine were in imminent risk of serious harm. The police officers made no observations regarding the children or the conditions inside the home. In fact, the officers were only on the scene because defendant Ponstingle had requested their assistance in the removal of the children. Nothing about the involvement of the North Olmsted Police Department would have independently given defendant Ponstingle reason to believe that a warrantless entry was appropriate. As such, the ruling in *Jordan* does not support a finding of qualified immunity, and the record provides no other basis for such a determination.

### 2. Defendants Downs and Kilbane

None of the North Olmsted Police Department officers who were at the Kovacic home on March 26, 2002 are named as defendants in the present action. The only individual City defendants that played any role in the actual entry into the home were defendants Kilbane and Downs. Sergeant Kilbane was present when defendant Ponstingle arrived at the North Olmsted Police Department and requested police assistance in removing Daniel and Katherine from the home. Defendant Kilbane reviewed the TEC Order and let the dispatch center know that a request was made for police assistance. He did not personally dispatch the officers, and was not on duty when the warrantless entry took place (Kilbane Depo. at 66-69). Officer Downs was on the phone with Nancy when the police arrived at the Kovacic home discussing a matter unrelated to the removal of the children (Downs Depo. at 46-47). Like Sergeant Kilbane,

Officer Downs was not at the home at the time of the entry.

While as discussed above, the right to be free from warrantless entries into one's home is a "clearly established right," there is no evidence that Sergeant Kilbane or Officer Downs violated that right. Even if, as plaintiffs maintain, Sergeant Kilbane was responsible for sending officers to the Kovacic home, he did not make the decision to force entry into the home.[18] Sending officers to accompany County social workers as they attempt to remove children believed to be at risk does not equate to breaking down the door to a private residence or ordering other officers on the scene to do so. Sergeant Kilbane was clearly off duty before that decision was made.

As for Officer Downs, plaintiffs speculate that "Downs talked to Mrs. Kovacic on the phone under the guise of discussing another matter, and intentionally failed to tell her why the police were coming to her door or that her children were being removed" (Docket No. 67 at 47). They offer no evidence to support this speculation, nor explain how this action, alone, rose to the level of a constitutional violation. In his deposition, Officer Downs testified that he was aware that Lieutenant Wolf wanted to know if he was able to get Nancy on the line, but that he specifically placed the call to follow up on an unrelated matter involving Nancy[19] (Downs Depo. at 30). He further testified that he knew that there was another police matter involving Nancy's kids but he did not have the specifics (Downs Depo. at 27-30). The fact that a superior may have relayed this information to officers at the scene, and ultimately those officers forced entry into the Kovacic home, does not mean that Officer Downs participated in the

---

[18] While plaintiffs suggest that: "[a]fter thoroughly discrediting Mrs. Kovacic [at the staffing], Kilbane then went back to the station and assisted the County in marshaling officers to help in the illegal removal, without looking carefully at the purported court order" (Docket No. 67 at 47).

[19] When asked: "Was your call, if not in your mind, the way it was structured by Lieutenant Wolf, basically a guise to see if she was home to get her talking? Answer: "As far as what I was doing […] It wasn't a guise. I mean somebody made a complaint. It was my job to follow-up […] I wanted to get her [Nancy's] side the story [regarding the dispute with Mrs. Kovacic-Nola], because it is just what we do" (Downs Depo. at 30).

unlawful entry. Because neither Kilbane nor Downs violated plaintiffs' Fourth Amendment rights, they are entitled to immunity from suit. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

### F.    *Conspiracy Claims*

Plaintiffs have raised claims of conspiracy under both federal and state law.[20] Specifically, plaintiffs allege that defendants conspired together to effectuate the unlawful entry into plaintiffs' home and the alleged wrongful removal of the children from the home (Amended Complaint at ¶ 21). Plaintiffs further accuse defendants of continuing to act in concert throughout the juvenile court proceedings to interfere with plaintiffs' right to family integrity (Amended Complaint at ¶ 22).

In order to demonstrate a conspiracy under 42 U.S.C. § 1985(3), a plaintiff must prove: "(1) a conspiracy involving two or more persons, (2) for the purpose of depriving, directly or indirectly, a person or class of persons the equal protection of the laws and (3) an act in furtherance of that conspiracy (4) that causes injury to person or property, or a deprivation of a right or privilege of a United States citizen. *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996). Under Ohio law, civil conspiracy is defined as a: "malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co*., 72 Ohio St. 3d 415, 419 (1995). *See Orbit Elecs, Inc. v. Helm Instrument Co.*, 167 Ohio App. 3d 301 (Ohio Ct. App. 2006) (Because Ohio law does not recognize a civil claim for conspiracy as an independent tort, an act for conspiracy cannot be maintained unless an underlying unlawful act is committed). Under either federal or Ohio law, a "conspiracy must be pled with some degree of specificity, and vague or conclusory allegations that are unsupported by material facts will not be sufficient to state a claim." *Avery v.*

---

[20] It should be noted that plaintiffs have failed to plead the identity of the statute under which they have brought their federal conspiracy claim. Nonetheless, for purposes of summary judgment, the Court will presume that plaintiffs' federal conspiracy claim was filed under 42 U.S.C. § 1985.

*City of Rossford*, 145 Ohio App. 3d 155, 165 (Ohio Ct. App. 2001). *See Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984) (conclusory language void of specific factual allegations was insufficient to support a conspiracy theory claim).

Plaintiffs have failed to offer any evidence to support a finding of an agreement between any of the defendants to violate plaintiffs' legal rights. The establishment of such an agreement is critical to plaintiffs' conspiracy claims. *Drum v. Nasuti*, 648 F. Supp. 888, 897 (E.D. Pa. 1986) ("Agreement to commit an unlawful act lies at the heart of civil conspiracy"). *See Collyer*, 93 F.3d at 229; *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985) (at a minimum, a plaintiff must demonstrate the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of that plan that caused injury to the plaintiff).

In their opposition brief, plaintiffs argue that Sergeant Kilbane and Officer Chung conspired with County defendants by giving false and misleading information at the March 26, 2002 staffing (Docket No. 67 at 43).  This unsupported allegation is belied by the fact that County defendants did not arrange for the officers to participate in the staffing. Indeed, plaintiffs make it very clear that the presence of Kilbane and Chung at the staffing was prompted by the allegedly "phony" affidavits prepared by Nancy's ex-husband (Docket No. 67 at 6). Plaintiffs even suggest that "[t]he County did not know the officers had been 'subpoenaed' and they thought the officers show up voluntarily to express their concerns" *Id*. Nor is there any evidence that, once present at the staffing, defendants hatched a plan to violate plaintiffs' rights. Without question, plaintiffs have failed to show that defendants acted pursuant to an agreement or a single plan at the staffing.

The same can be said for the warrantless entry on March 26, 2002.

33

Plaintiffs suggest that officers and County defendants must have acted in furtherance of a conspiracy because County defendants knew that the TEC Order did not entitle them to enter plaintiffs' home, "yet they told the police they had a court order to remove the children" (Docket No. 67 at 43). This unsupported piece of speculation fails to demonstrate that County and City defendants acted in furtherance of a single plan.[21]

The federal conspiracy claim also fails for the additional reason that plaintiffs have failed to even allege that plaintiffs were targeted for this conspiracy because of their membership in a protected class. Section 1985(3) requires that there be some racial or other invidious class-based discriminatory animus behind the conspirators' action. *United Brotherhood of Carpenters and Joiners, Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983). *See Collyer*, 98 F.3d 233. Absent such an allegation, a § 1985(3) conspiracy claim is subject to dismissal. *See e.g., Jaco*, 39 F. 2d at 245. As such, defendants are entitled to summary dismissal of Counts VI and VIII of the Amended Complaint.[22]

### G.    *Remaining State Tort Claims*

In Count IX of the Amended Complaint, plaintiffs raise a claim for intentional infliction of emotional distress (Amended Complaint at ¶ 60-61). Defendants argue that the governmental entities and the individually identified defendants are immune from plaintiffs' state law torts claims under Ohio Rev. Code § 2744. While plaintiffs do not address this issue, the Court has reviewed the pleadings with respect to § 2744 and has found defendants' argument to be well taken.

Ohio Rev. Code § 2744.02 provides immunity from tort actions for

---

[21] Moreover, at the risk of overstating the obvious, if the police believed that the TEC Order entitled them to enter the house, which the Court has already ruled it did not, their entry, though unjustified, would have been motivated by their misunderstanding of Fourth Amendment requirements, rather than in furtherance of some nefarious plan.

[22] For the reasons set out in the next section of this Memorandum Opinion, plaintiffs' state conspiracy claim would also be barred by Ohio Rev. Code § 2744.

political subdivisions acting in a governmental or proprietary function, and lays out specific exceptions. *Cater v. City of Cleveland*, 83 Ohio St. 3d 24, 28-29 (1998). The following section, § 2744.03, provides, among other things, similar immunity and exceptions for employees of political subdivisions. *Chesher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007). All of the acts that form the basis for plaintiffs' claim for intentional infliction of emotional distress were performed in connection with a "governmental function."[23] Moreover, inasmuch as the tort in question involves an intentional act, none of the exceptions in § 2744.02(B), including the exception found at § 2744.02(B)(4), apply. *See Wilson*, 70 Ohio St. 3d at 452 (no exceptions to § 2744.02 immunity for torts of fraud and intentional infliction of emotional distress); *Thayer v. W. Carrollton Bd. of Educ.*, 2004 Ohio App. LEXIS 3571, *6 (Ohio Ct. App., Montgomery County, July 23, 2004) ("Because an intentional tort is not the result of negligence, an intentional tort is not an exception to the broad immunity generally enjoyed by political subdivisions.") Consequently, defendants City and County are entitled to immunity from plaintiffs' state tort claims.

As for the individual County and City defendants, plaintiffs fail to prove or even allege that the actions of these defendants were "outside the scope of the employees['] employment or official responsibilities." § 2744.03(A)(6)(a). Nor have plaintiffs offered more than conclusory allegations to show that the acts were with "malicious purpose, in bad faith, or in wanton or reckless manner." § 2744.03(A)(6)(b). The individual defendants are, therefore, also entitled to immunity from the state tort claims. *See e.g., Chesher*, 477 F.3d at 797.

---

[23] Under Ohio Rev. Code § 2744.01(C), "government functions" include the operation of a job and family services department or agency. Ohio Rev. Code § 2744.01.(C)(2)(m). *Wilson v. Stark County Dep't of Human Servs.*, 70 Ohio St. 3d 450, 452 (1994). Additionally, "government functions" include the provision of police services. Ohio Rev. Code § 2744.01(C)(2)(a).

## IV.

## CONCLUSION

For all of the foregoing reasons, defendants' motions for summary judgment (Docket Nos. 42 and 56) are **GRANTED**, in part, and **DENIED**, in part. All claims brought by plaintiff Nancy Kovacic against any and all defendants are **DISMISSED** as time-barred. With respect to the claims brought by plaintiffs Daniel and Katherine Kovacic, Counts II, III, IV, VI, VII, VIII, and IX of the Amended Complaint are **DISMISSED**. The portion of Count I relating to the unlawful entry into the Kovacic home survives. The remainder of Count I is **DISMISSED**. Similarly, Count V, providing municipal liability against the County and the City survives with respect to the unlawful entry, but otherwise fails for the remaining portions of that claim. Additionally, defendants Pam Cameron, Vikki Csornok, Pam Gaylord, Michael Kilbane, Frank Chung, and John Downs, to the extent they are sued in their individual capacity, are **DISMISSED** from this action.

**IT IS SO ORDERED.**

Dated: July 9, 2007

*s/ Sara Lioi*
Hon. Sara Lioi
United States District Judge